Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Local Counsel for Plaintiff*

Vik Pawar
**PAWAR LAW GROUP, P.C.**
20 Vesey Street, Suite 1410
New York, NY 10007
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vikrantpawaresq@gmail.com

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAY WESTERMAN, derivatively on behalf of WRAP TECHNOLOGIES, INC. <br><br> Plaintiff, <br><br> v. <br><br> MARC THOMAS, THOMAS P. SMITH, JAMES A. BARNES, MICHAEL ROTHANS, SCOT J. COHEN, PATRICK KINSELLA, DAVID NORRIS, MICHAEL PARRIS, and WAYNE R. WALKER, <br><br> Defendants, <br><br> and <br><br> WRAP TECHNOLOGIES, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> DEMAND FOR JURY TRIAL |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Ray Westerman ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively on behalf of Nominal Defendant Wrap Technologies, Inc. ("Wrap" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Marc Thomas, Thomas P. Smith, James A. Barnes, Michael Rothans, Scot J. Cohen, Patrick Kinsella, David Norris, Michael Parris, and Wayne R. Walker (collectively, the "Individual Defendants," and together with Wrap, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Wrap and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Wrap, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Wrap's directors and officers from April 29, 2020 through September 23, 2020, including both dates (the "Relevant Period").

2.     Wrap is a Delaware corporation, founded in March 2016 and headquartered in Arizona. Wrap sells security-related technology to its customers, who largely work in law enforcement and security. The Company's main product is BolaWrap, a hand-held

device that fires an eight-foot bola-like tether at high speed to encircle a person ten to twenty-five feet away. Wrap touts BolaWrap as "remote handcuffs" which can "safely" and "humanely" restrain people at range "without relying on pain compliance tools."

3.    Wrap was founded on March 2, 2016 by Defendants James A. Barnes ("Barnes") and Scot J. Cohen ("Cohen"), as well as Elwood G. "Woody" Norris ("E. Norris"), the Company's Chief Technology Officer ("CTO"). At that time it was a Delaware limited liability company with its headquarters in Las Vegas, Nevada. By December 2016, the first BolaWrap prototype was being demonstrated.

4.    In September 2019, Wrap moved its manufacturing facilities to Tempe, Arizona where it had increased manufacturing capacity for BolaWrap.

5.    Shortly thereafter, on December 3, 2019, the Los Angeles Police Department (the "LAPD") announced that it would train its officers to use BolaWrap and deploy 200 devices in a pilot program (the "LAPD Pilot Program"). LAPD Deputy Chief Martin Baeza, Head of the Personnel and Training Bureau, stated that the pilot program would be used to determine if BolaWrap would satisfy the "needs and standards" of the LAPD.

6.    The Los Angeles Board of Police Commissioners ("LAPD Commissioners"), authorized the start of the LAPD Pilot Program on February 5, 2020. Although the LAPD Pilot Program was originally slated for 90 days, the LAPD Commissioners extended it to 180 days.

7.    On April 29, 2020, the Company issued a press release concerning Wrap's first fiscal quarter 2020 financial results which highlighted the LAPD Pilot Program. During an April 29, 2020 earnings call concerning the first fiscal quarter 2020, Defendants Thomas P. Smith ("Smith") and Michael Rothans ("Rothans") characterized BolaWrap's limited adoption as a temporary development.

8.    However, the truth was that BolaWrap's utility in the field, and therefore Wrap's financial outlook, were under question. On July 22, 2020, this truth started becoming public when *Seeking Alpha* published a research report by *White Diamond*

Verified Shareholder Derivative Complaint

*Research* ("First White Diamond Report") which called BolaWrap an "impractical device" with a very limited market.

9.    As a result of this news, the Company's share price fell from $11.89 at the close of trading on July 21, 2020, to an intraday low of $10.62 per share, a drop of nearly 10.7%, before closing July 22, 2020 at $11.34,  representing a 4.6% loss.

10.    However, the Company's false and misleading statements did not end following this report. On July 30, 2020, during an earnings call concerning the second fiscal quarter 2020, Defendant David Norris ("Norris") implied that BolaWrap was frequently being deployed in the context of the LAPD Pilot Program.

11.    However, the *Los Angeles Times* later published an article, after the market closed on August 25, 2020,  reporting that the LAPD Commissioners approved the LAPD Chief of Police's request to extend the LAPD Pilot Program for an additional 180 days and disclosed certain limited instances where BolaWrap was used.

12.    The news of limited use caused the Company's share price to drop from $8.77 to $8.27 from close of trading on August 25, 2029 to close of trading on August 27, 2020, a drop of more than 5.7% over two days.

13.    Throughout the Relevant Period, the Individual Defendants caused the Company to make statements about the LAPD's "great" and "positive" experience with the LAPD Pilot Program and portrayed its extension as a "very good thing." Moreover, they stated that "[i]f [the] LAPD didn't like the product, they wouldn't be asking for extensions." However, satisfaction was not the LAPD's motivation for extending the program. In truth, after the first six months LAPD officers had barely used BolaWrap and extended the LAPD Pilot Program simply to "continue to evaluate the BolaWrap for effectiveness."

14.    On September 23, 2020, the truth fully emerged when *Seeking Alpha* published a report by *White Diamond Research*  (the "Second White Diamond Report") revealing that Wrap had hidden an LAPD report which had "disastrous" news about the

3

LAPD Pilot Program. Among other things, Second White Diamond Report revealed, that "[o]ver a six-month period, 200 BolaWrap devices in the hands of 1,100 LAPD officers in the field were only used nine times, and only worked once." The Second White Diamond Research Report also revealed that "[a]t least 191 BolaWraps weren't used at all in the pilot program, they were just sitting there collecting dust" which "was about the worst result that could've happened from the program."

15.     Following this report, the Company's share price fell from $8.14 at close of trading on September 22, 2020, to an intraday low of $5.68 per share—a drop of more than 30.2%—before closing at $6.07 on September 23, 2020, a loss of roughly 25.4%.

16.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make materially false and misleading statements about Wrap. The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements which failed to disclose, *inter alia*, that: (1) BolaWrap lacked utility due to its design being effective in only a very narrow set of circumstances (2) as a result of which, it was unlikely to be adopted for widespread use in the field; (3) Wrap had hidden the results of the LAPD Pilot Program, which revealed that BolaWrap was largely unused and ineffective and that the LAPD Pilot Program was only extended due to an insufficient sample size of BolaWrap deployments; (4) based on the LAPD Pilot Program, the LAPD and other police departments were unlikely to purchase BolaWrap devices and which seriously undermined the product's ability to generate revenue for Wrap; (5) the Company failed to maintain internal controls; and (6) as a result, the Defendants' statements about the Company were materially false and misleading at all relevant times.

17.     In addition, the Individual Defendants breached their fiduciary duties by failing to correct, and/or causing the Company to fail to correct, these materially false and misleading statements and omissions.

18.    Moreover, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

19.    Further, two of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales during the Relevant Period, for a combined total of over $258,588.

20.    The Individual Defendants' misconduct has subjected the Company, its former Chief Executive Officer ("CEO"), its President, and its Chief Financial Officer ("CFO") to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (with its current Chief Government Affairs Office ("CGAO") and former CEO, Defendant Marc Thomas ("Thomas"), and current Chief Strategy Officer ("CSO") and former Chief Operating Officer ("COO"), Defendant Rothans, being named as defendants in one of constituent class actions)[1] (the "Consolidated Class Action"), the need to undertake internal investigations, and the need to implement adequate internal controls over its financial reporting.  As a result of which, the Company will have to expend many millions of dollars.

21.    In light of the Individual Defendants' breaches of fiduciary duty, most of which Individual Defendants are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the former and current CEO's, the President's, the COO's, and the CFO's liability in the Consolidated Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Wrap's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

---

[1] As of January 19, 2021, there is no amended complaint following the consolidation of the cases in the Consolidated Class Action, and so it remains to be seen who the final Defendants are.

## **JURISDICTION AND VENUE**

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

23.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Consolidated Class Action based on violations of the Exchange Act.

24.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

25.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

27.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

28.     Venue is proper in this District because Wrap and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## **PARTIES**

### **Plaintiff Ray Westerman**

29.     Plaintiff is a current shareholder of Wrap common stock. Plaintiff purchased Wrap stock during the beginning of the Relevant Period and has continuously owned that stock since that time.

### **Nominal Defendant Wrap**

Verified Shareholder Derivative Complaint

30.    Wrap is a Delaware corporation with headquartered at 1817 W 4th Street, Tempe, Arizona 85281. Wrap's shares trade on the NASDAQ Capital Market under the ticker symbol "WRTC."

**Defendant Marc Thomas**

31.    Defendant Thomas has served as the Company's CGAO since October 29, 2020. Before that time, he was the Company's CEO from July 30, 2020 until October 27, 2020. According to the current report filed on October 30, 2020 on Form 8-K with the SEC, Defendant Thomas is entitled to receive an annual base salary of $400,000 as compensation for his services as the CGAO. Defendant Thomas is also eligible to receive an additional cash bonus after each calendar year of his employment. According to the current report filed on July 31, 2020 on Form 8-K with the SEC, Defendant Thomas was entitled to receive an annual base salary of $400,000 as compensation for his time as CEO.

**Defendant Thomas P. Smith**

32.    Defendant Smith has been the Company's President since March 2019 and the Company's Interim CEO since October 27, 2020. Before that, he served as a consultant to Wrap. According to the Company's Schedule 14A filed on April 20, 2020 with the SEC (the "2020 Proxy Statement"), as of April 9, 2020, Defendant Smith beneficially owned 388,889 shares of the Company's common stock, representing 1.3% of the Company's outstanding common stock at that time. The Company's common stock at the close of trading on April 9, 2020 was worth $4.36 per share, meaning Defendant Smith owned nearly $1.7 million worth of Wrap stock at that time.

33.    For the fiscal year ended December 31, 2019, Defendant Smith received $2,268,421 in compensation from the Company, including $197,917 in salary, $2,060,088 in option awards, and $10,416 in all other compensation.

**Defendant James A. Barnes**

34.    Defendant Barnes cofounded the Company and has been the Company's CFO since March 2017, and the Company's Secretary and Treasurer since January 2018.

Previously, he was President of the Company from March 2017 until January 4, 2018 and a Company director from March 2017 until November 14, 2018. Before that, he was a Manager from March 2016 until the Company's incorporation in March 2017. According to the 2020 Proxy Statement, as of April 9, 2020, Defendant Barnes beneficially owned 2,401,394 shares of the Company's common stock, representing 7.9% of the Company's outstanding common stock at that time. The Company's common stock at the close of trading on April 9, 2020 was worth $4.36 per share, meaning Defendant Barnes owned nearly $10.5 million worth of Wrap stock at that time.

35.    For the fiscal year ended December 31, 2019, Defendant Barnes received $303,666 in compensation from the Company, including $180,000 in salary and $123,666 in stock awards. For the fiscal year ended December 31, 2018, Defendant Barnes received $194,056 in compensation from the Company, including $120,000 in salary and $74,056 in option awards.

36.    When the Company was materially misstating information to keep the stock price inflated, and before such actions were revealed, Defendant Barnes made the following sales of Company stock, and made no purchases:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| 6/11/2020 | 6,000 | $6.73 | $40,380 |
| 7/1/2020 | 6,000 | $10.50 | $63,000 |
| 8/3/2020 | 6,000 | $10.04 | $60,240 |
| 9/1/2020 | 6,000 | $8.94 | $53,640 |

In total, he sold 24,000 Company shares on inside information for which he received nearly $217,260 in proceeds. These insider sales made with knowledge of material nonpublic information demonstrate his motive in facilitating and participating in the scheme.

**Defendant Michael Rothans**

37.    Defendant Rothans served as the Company's COO since November 2018 until July 2020, when his title was changed to CSO. Prior to that, he served as the Company's Senior Vice President of Business Development from September 2017 until November 2018. According to the 2020 Proxy Statement, as of April 9, 2020, Defendant Rothans

8

beneficially owned 117,971 shares of the Company's common stock. The Company's common stock at the close of trading on April 9, 2020 was worth $4.36 per share, meaning Defendant Rothans owned nearly $514,354 worth of Wrap stock at that time.

38.    When the Company was materially misstating information to keep the stock price inflated, and before such actions were exposed, Defendant Rothans made the following sale of Company stock, and made no purchases:

| Date | Shares | Cost | Proceeds |
|------|--------|------|----------|
| 6/3/2020 | 4,800 | $8.61 | $41,328 |

In total, he sold 4,800 Company shares on inside information for which he received $41,328 in proceeds. This insider sale made with knowledge of material nonpublic information demonstrates his motive in facilitating and participating in the scheme.

**Defendant Scot J. Cohen**

39.    Defendant Cohen cofounded the Company and was the Company's Executive Chair since July 2017. Previously, he served as the Company's Secretary until January 2018 and as a Manager from March 2016 until the Company's incorporation in March 2017. Additionally, Defendant Cohen founded, owns, and serves as the Managing Partner of V3 Capital Partners, LLC since 2015. According to the 2020 Proxy Statement, as of April 9, 2020, Defendant Cohen beneficially owned 5,409,906 shares of the Company's common stock, representing 17.9% of the Company's outstanding common stock on that date. The Company's common stock at the close of trading on April 9, 2020 was worth $4.36 per share, meaning Defendant Cohen owned nearly $23.6 million worth of Wrap stock at that time.

40.    For the fiscal year ended December 31, 2019, Defendant Cohen received $120,000 in compensation from the Company for nondirector services.

**Defendant Patrick Kinsella**

41.    Defendant Patrick Kinsella ("Kinsella") has been a Company director since November 2018. He also serves as the Chair of the Audit Committee, and as a member of both the Compensation Committee and the Nominating and Governance Committee.

According to the 2020 Proxy Statement, as of April 9, 2020, Defendant Kinsella beneficially owned 56,250 shares of the Company's common stock. The Company's common stock at the close of trading on April 9, 2020 was worth $4.36 per share, meaning Defendant Kinsella owned approximately $245,250 worth of Wrap stock at that time.

42.    For the fiscal year ended December 31, 2019, Defendant Kinsella received $42,000 in compensation from the Company, all in fees earned or paid in cash.

**Defendant Norris**

43.    Defendant Norris has been a Company director since January 2018. Previously, he was the Company's CEO from December 2018 until July 30, 2020. According to the 2020 Proxy Statement, as of April 9, 2020, Defendant Norris beneficially owned 2,336,596 shares of the Company's common stock, representing 7.6% of the Company's outstanding common stock on that date. The Company's common stock at the close of trading on April 9, 2020 was worth $4.36 per share, meaning Defendant Norris owned nearly $10.2 million worth of Wrap stock at that time.

44.    For the fiscal year ended December 31, 2019, Defendant Norris received $798,325 in compensation from the Company, including $180,000 in salary and $618,325 in stock awards. For the fiscal year ended December 31, 2018, Defendant Norris received $388,238 in compensation from the Company, including $120,000 in salary and $268,238 in option awards.

**Defendant Michael Parris**

45.    Defendant Parris ("Parris") has been a Company director since November 2017. He also serves as a member of each of the Audit Committee, Compensation Committee, and Nominating and Governance Committee. According to the 2020 Proxy Statement, as of April 9, 2020, Defendant Parris beneficially owned 248,000 shares of the Company's common stock. The Company's common stock at the close of trading on April 9, 2020 was worth $4.36 per share, meaning Defendant Parris owned nearly $1.1 million worth of Wrap stock at that time.

Verified Shareholder Derivative Complaint

46.    For the fiscal year ended December 31, 2019, Defendant Parris received $42,000 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

**Defendant Wayne R. Walker**

47.    Defendant Wayne R. Walker ("Walker") has been a Company director since November 2018. He also serves as the Chair of both the Compensation Committee and Nominating and Governance Committee, and as a member of the Audit Committee. According to the 2020 Proxy Statement, as of April 9, 2020, Defendant Walker beneficially owned 26,250 shares of the Company's common stock. The Company's common stock at the close of trading on April 9, 2020 was worth $4.36 per share, meaning Defendant Walker owned nearly $114,450 worth of Wrap stock.

48.    For the fiscal year ended December 31, 2019, Defendant Walker received $42,000 in compensation from the Company, all in fees earned or paid in cash.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

**Background**

49.    Wrap is a security-related technology company which was founded in March 2016 as an LLC and later incorporated in Delaware in March 2017. The Company is headquartered in Tempe, Arizona. The Company's main product is BolaWrap, a hand-held device that fires an eight-foot bola-like tether at high speed to encircle a person ten to twenty-five feet away. Wrap describes BolaWrap as "remote handcuffs" that can "safely" and "humanely" restrain people from a distance "without relying on pain compliance tools."

50.    On March 22, 2017, the Company merged with MegaWest Energy Montana Corp. ("MegaWest"), a wholly owned subsidiary of Petro River Oil Corp., a company that was significantly owned by Defendant Cohen. MegaWest then changed its name to Wrap.

51.     After developing and demonstrating BolaWrap prototypes, in November 2017, Wrap entered production began trial deployments of BolaWrap with a few law enforcement agencies.

52.     In 2018, the Company delivered around two hundred free BolaWrap devices to certain law enforcement agencies to solicit feedback. In October 2018, and with the aid of the solicited feedback, the Company debuted a green line laser accessory to assist a user in accurately deploying BolaWrap.

53.     In September 2019, Wrap moved its manufacturing facilities to Tempe, Arizona to increase production capacity.

54.     On December 3, 2019, the *Los Angeles Times* reported on the LAPD's decision to engage in the LAPD Pilot Program. LAPD Deputy Chief Martin Baeza, Head of the Personnel and Training Bureau, stated that the LAPD Pilot Program would determine if BolaWrap would satisfy the "needs and standards" of the LAPD. The article also quoted Fort Worth, Texas Police Department SWAT Officer, Donald McCreery, the first police officer who had deployed BolaWrap in the field, who stated BolaWrap "has to fit the situation" in order to be used successfully.

55.     Just over a month later, on January 8, 2020, Michael R. Moore, the LAPD's Chief of Police, circulated a memo that detailed the department's guidelines for the LAPD Pilot Program (the "LAPD Pilot Program Guidelines"). The LAPD Pilot Program Guidelines advised that "officers shall exercise de-escalation techniques to resolve potential use of force incidents" "whenever practicable[.]" Moreover, the LAPD Pilot Program Guidelines detailed specific circumstances that must be present to justify the deployment of BolaWrap. The LAPD Pilot Program Guidelines stated, in relevant part:

Officers may deploy the BolaWrap when the circumstances perceived by the officer indicate that:

a. An individual needing to be detained or controlled indicates through words or action that he or she will resist arrest, or will not voluntarily comply with lawful orders; or,

b. The individual has demonstrated, by words or action, an intention to be violent or to physically resist, and reasonably appears to present the potential to harm officers, himself/herself or others.

56.    The LAPD Pilot Program Guidelines further state that "officers shall report any use of the BolaWrap during a tactical incident[.]"

57.    The LAPD Commissioners authorized the start of the LAPD Pilot Program on February 5, 2020. Although the LAPD Pilot Program was slated to take place over 90 days, the LAPD Commissioners extended the LAPD Pilot Program's initial term to 180 days.

58.    Later, at an August 25, 2020 hearing, the LAPD Commissioners approved the LAPD Chief of Police's request to extend the LAPD Pilot Program for an additional 180 days on top of the initial term to continue to evaluate BolaWrap.

**False and Misleading Statements**

***April 29, 2020 Form 10-Q & Earnings Call***

59.    On April 29, 2020, the Company filed a quarterly report for the fiscal quarter ended March 31, 2020 on Form 10-Q with the SEC (the "1Q 2020 10-Q"). The 1Q 2020 10-Q was signed by Defendant Barnes and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed by Defendants Norris and Barnes attesting to the accuracy of the financial statements in the 1Q 2020 10-Q, the disclosure of any material changes Wrap's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

60.    The 1Q 2020 10-Q stated the following, in relevant part, concerning the Company's internal controls:

Verified Shareholder Derivative Complaint

There have been no changes in our internal control over financial reporting during our fiscal quarter ended March 31, 2020, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Our process for evaluating controls and procedures is continuous and encompasses constant improvement of the design and effectiveness of established controls and procedures and the remediation of any deficiencies, which may be identified during this process.

61.    The 1Q 2020 10-Q stated the following, in relevant part, concerning the Company's disclosure controls:

Under the supervision and with the participation of our management, including our principal executive officer and our principal financial officer, as of March 31, 2020 we conducted an evaluation of our disclosure controls and procedures as such term is defined under Rules 13a-15(e) and 15d-15(e) promulgated under the Securities Exchange Act of 1934, as amended. ***Based on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level***.

(Emphasis added.)

62.    On April 29, 2020, the Company also issued a press release concerning the first fiscal quarter 2020. The press release stated, in relevant part:

**First Quarter and Recent Operational Highlights**:[2]

- In February, began field testing BolaWrap with hundreds of officers in the Los Angeles Police Department (LAPD), the third largest police department in the U.S. with more than 9,000 sworn officers
- Received new orders for BolaWraps from police agencies in California, Missouri, Illinois, Virginia, Louisiana, Maryland, Minnesota, and Washington during March 2020
- Shipped international purchase orders for 200 BolaWraps and 2,000 cartridges and accessories
- Q1 international shipments raise the total countries receiving BolaWrap products to 19

---

[2] Emphasis in original.

Verified Shareholder Derivative Complaint

63.    Furthermore, also on April 29, 2020, the Company held an earnings conference call concerning the first fiscal quarter 2020. During that call, Defendant Smith stated:

> As many of you are aware, LAPD began field testing the BolaWrap in February of this year. 200 BolaWraps have been circulating among approximately 1,100 trained officers throughout L.A. City. As of today, they are a little over two-thirds of the way through their original 90-day trial period, however given what the complications the department has faced from the coronavirus, we expect that they will likely extend the field trial and we will be more than happy to continue to support the department.

64.    Defendant Rothans similarly stated:

> Many agencies across the U.S. are only responding to emergency calls and not routine calls, which means as supposedly being proactive and maybe encountering somebody self initiated activities for somebody that's suffering from mental health crisis, somebody under the influence, now they're encouraged to stay away from that individual. So, that does limit the use and we've actually seen that even in LAPD's trial, but this of course is a limited period of time.

## **Truth Begins to Emerge as False and Misleading Statements Continue**

65.    On July 22, 2020, as discussed above, *Seeking Alpha* published the First White Diamond Report entitled: "Wrap Technologies: Batman Device Is Mostly Impractical In The Real World - $3 Price Target." The First White Diamond Report described BolaWrap as an "impractical device" with a "very small" market. Moreover, the First White Diamond Report stated, in relevant part:

> [T]he BolaWrap is an impractical device with a limited use-case for law enforcement. As the tether extends 8 feet when fired, it requires at least 4 feet on either side of the target to extend properly, and a minimum of 10 feet of further separation between the officer and the target.

* * *

We've spoken with many police officers asking if they would ever use the BolaWrap. Many have told us that using this device would be in such rare situations, that it would be hard to use.

The only plausible application of the device appears to be during street stops. Which are when a police officer stops a citizen on the street to ask questions or ask to conduct a search. According to the US Department of Justice . . . only ~1.0% of police to public contact takes place during street stops. Even more extreme, is that only 4.1% . . . of the altercations typically lead to an arrest. And this is further narrowed by the subsegment already being served by many other devices.

\* \* \*

BolaWrap's TAM (Total Addressable Market) is very small. Lots of space is needed to successfully execute the device. . . . Most importantly, the device is only being marketed for the use on the mentally ill . . . .

The combination of both a limited target market and the device's impracticality in most environments points to a significant limitation for the TAM. With most mental health episodes taking place domestically, police department demand and resulting sales are likely to remain constrained.

66.    The First White Diamond Report also predicted that Wrap had probably been unable to make a deal with the LAPD, stating in relevant part:

The Los Angeles Police Department ("LAPD") started a 90 day field trial with the BolaWrap in February of this year. At the time, this was a big deal, and was parroted a lot in the media in December/January right before the field trial. However, after January, the BolaWrap hasn't been the media with respect to the LAPD.

\* \* \*

At this point, it has been three months since WRTC's earnings call where Smith said the LAPD field trial is two-thirds finished. If the LAPD really felt a strong need for it, we believe the deal would have been announced by now. Since it hasn't been announced, then the clear implication is that it appears that LAPD decided not to make the purchase, or at least one that matters.

67.    As a result of this news, the Company's share price fell from $11.89 at the close of trading on July 21, 2020, to an intraday low of $10.62 per share, a drop of nearly 10.7%, before closing July 22, 2020 at $11.34, representing a 4.6% loss.

### July 30, 2020 Earnings Call

68.    On July 30, 2020, Wrap held an earnings conference call related to the second fiscal quarter 2020. On the call, Defendant Norris touted figures including that the "LAPD trained about 1,100 officers and they do have 200 devices in the field 24 hours a day with those 1,100 officers."

69.    Defendant Smith further touted data coming from the LAPD Pilot Program, stating:

> There is one large department within the U.S. that we've been undergoing trials with and that is the Los Angeles Police Department.

> When this program first started, we initially thought that the trial period would last approximately 90 days. However, with optional extensions – periods built in the agreement, some of which have already been exercised. There was the potential for this trial to last for upwards of one year. Bear in mind, those terms were discussed before the Coronavirus began to impact the U.S. in earnest and therefore, they are subject to change.

> **The current extension is set to end in August, but it is possible and most likely we will see another extension exercised. I am fully aware that humans are risk adverse beings. And so, there is a natural tendency to fill the void left by uncertainty with negative speculations. So, let me try to put some of those at ease. Extensions are a very good thing.**

> **If LAPD didn't like the product, they wouldn't be asking for extensions, and we have continued to receive positive feedback from them.**

> To conduct this trial, LAPD had to train 1,100 officers on the BolaWrap. They committed approximately 8,800 hours to training which is equivalent to four man years that's a massive investment on their part. The opportunity cost of pulling that many officers out of rotation and into training should not be discounted. They've committed substantial resources towards this project.

*So rest assured they are spending the time that they believe is adequate to give the BolaWrap an honest and thorough evaluation. Regardless of how this trial ultimately goes, it's clear from the domestic and international reception so far that the BolaWrap is gaining traction*.

(Emphasis added.)

70.    The statements in ¶¶ 59–64 and 68–69 were materially false and misleading. Moreover, they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) BolaWrap lacked utility due to its design being effective in only a very narrow set of circumstances (2) as a result of which, it was unlikely to be adopted for widespread use in the field; (3) Wrap had hidden the results of the LAPD Pilot Program, which revealed that BolaWrap was largely unused and ineffective and that the LAPD Pilot Program was only extended due to an insufficient sample size of BolaWrap deployments; (4) based on the LAPD Pilot Program, the LAPD and other police departments were unlikely to purchase BolaWrap devices and which seriously undermined the product's ability to generate revenue for Wrap; (5) the Company failed to maintain internal controls; and (6) as a result, the Defendants' statements about the Company were materially false and misleading at all relevant times. .

### July 31, 2020 Form 10-Q

71.    On July 31, 2020, the Company filed a quarterly report for the fiscal quarter ended June 30, 2020 on Form 10-Q with the SEC (the "2Q 2020 10-Q"). The 2Q 2020 10-Q was signed by Defendant Barnes and contained SOX Certifications signed by Defendants Norris and Barnes attesting to the accuracy of the financial statements in the 2Q 2020 10-Q, the disclosure of any material changes to Wrap's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

72.    The 2Q 2020 10-Q stated the following, in relevant part, concerning the Company's internal controls:

There have been no changes in our internal control over financial reporting
during our fiscal quarter ended June 30, 2020, that have materially affected,
or are reasonably likely to materially affect, our internal control over financial
reporting. Our process for evaluating controls and procedures is continuous
and encompasses constant improvement of the design and effectiveness of
established controls and procedures and the remediation of any deficiencies,
which may be identified during this process.

73.    The 2Q 2020 10-Q stated the following, in relevant part, concerning the
Company's disclosure controls:

Under the supervision and with the participation of our management,
including our principal executive officer and our principal financial officer, as
of June 30, 2020 we conducted an evaluation of our disclosure controls and
procedures as such term is defined under Rules 13a-15(e) and 15d-15(e)
promulgated under the Securities Exchange Act of 1934, as amended. ***Based
on this evaluation, our principal executive officer and our principal
financial officer concluded that our disclosure controls and
procedures were effective at the reasonable assurance level***.

(Emphasis added.)

### *August 25, 2020 Los Angeles Times Article*

74.    On August 25, 2020, after the market closed, the *Los Angeles Times* published
an article entitled, "LAPD will keep testing BolaWrap, a device meant to immobilize
suspects from a distance," which reported the LAPD's extension of the LAPD Pilot
Program. The article described how, in relevant part:

Los Angeles police will continue testing a tether restraint designed to help
immobilize suspects from a distance — known as the BolaWrap — after an
initial six-month pilot program produced too little data to gauge the tool's
overall effectiveness.

At the department's request, the Police Commission unanimously granted a
180-day extension to the program during its meeting Tuesday morning.

Since the initial 180-day pilot began in February, LAPD officers have used
the BolaWrap a total of nine times. It was deemed "effective" in six instances.

According to an LAPD report on those incidents provided to the commission, successful deployments helped take various suspects into custody, including a naked man running through traffic, a suspect wielding a pipe, a suspect with a knife, and an arson suspect.

The devices were ineffective in one incident in which a suspect was up against a fence, in another where a suspect wore a very a large, bulky coat, and another in which the officer who fired the tether missed the suspect, the report said.

Deputy Chief Martin Baeza told the commission that the department hoped to gather data from more deployments in the coming months to help determine whether to keep using the BolaWrap.

He said the devices were meant to assist officers in bringing potentially dangerous situations to an end without using more deadly force, and that he remained optimistic they could serve that purpose.

Baeza said the LAPD was also working with the manufacturer of the BolaWrap, which provided 200 devices for testing, to see if improvements might be made to make the devices more effective.

75.    The news of limited use caused the Company's share price to drop from $8.77 to $8.27 from close of trading on August 25, 2029 to close of trading on August 27, 2020, a drop of more than 5.7% over two days.

### September 3, 2020 LD 500 Virtual Conference

76.    On September 3, 2020, Defendant Smith presented for Wrap at the LD 500 Virtual Conference. In his presentation he did not discuss the LAPD Pilot Program's results, instead stating that, in relevant part:

We're used in over 210 agencies around the United States, the largest being so far the Los Angeles Police Department, or LAPD. They've trained 1,100 officers and have over 200 devices out on the street. ***They are about halfway through their field trial, they'll be wrapping that up in early February of next year. And so far they've had great feedback from the officers and their uses so far***.

(Emphasis added.)

Verified Shareholder Derivative Complaint

77.    Answering a question about the annual cartridge usage per unit in the field, Defendant Smith replied:

It's really hard to say at this point because we're getting very skewed data from the number of trainings that we have, and the number of cartridges that are being ordered.

78.    In response to another question about "how often police departments use it," Defendant Smith stated, "[w]e're working with agencies to try and get that info. But a lot of times they're not tracking this info so it's a bit more difficult for us."

79.    On September 9, 2020, just a few days later, Defendant Smith presented for the Company at the 9th Annual Gateway Conference. During this presentation, Defendant Smith repeated his claims concerning the LAPD's feedback, did not disclose results of the LAPD Pilot Program, and stated, in relevant part:

We're used in over 210 agencies around the United States, the largest being so far the Los Angeles Police Department, or LAPD. They've trained 1,100 officers and have over 200 devices out on the street. ***They are about halfway through their field trial, they'll be wrapping that up in early February of next year. And so far they've had great feedback from the officers and their uses so far***.

(Emphasis added.)

80.    The statements in ¶¶ 71–73 and 76–79 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) BolaWrap lacked utility due to its design being effective in only a very narrow set of circumstances (2) as a result of which, it was unlikely to be adopted for widespread use in the field; (3) Wrap had hidden the results of the LAPD Pilot Program, which revealed that BolaWrap was largely unused and ineffective and that the LAPD Pilot Program was only extended due to an insufficient sample size of BolaWrap deployments; (4) based on the LAPD Pilot Program, the LAPD and other police departments were unlikely to

purchase BolaWrap devices and which seriously undermined the product's ability to generate revenue for Wrap; (5) the Company failed to maintain internal controls; and (6) as a result, the Defendants' statements about the Company were materially false and misleading at all relevant times.

## The Full Truth Emerges

81.    On September 23, 2020, as described above, *Seeking Alpha* published the Second White Diamond Report entitled: "Wrap Technologies: Disastrous LAPD Pilot Program Results, No Evidence These Have Been Communicated to Investors." The Second White Diamond Report discussed a "key milestone failure" from an August 25, 2020 LAPD report which had been filed after the LAPD Pilot Program's initial six-month term expired. The Second White Diamond Report further stated that the Company had concealed the "disastrous" LAPD report from the public. Specifically, the Second White Diamond Report stated, in relevant part:

> ***The LAPD Pilot Program Results Have Been Revealed –***
> ***And It Is Ugly***
>
> The LAPD and the respective BolaWrap trials have been a common theme in WRTC presentations since December 2019. The company's management has seemingly failed to disclose, however, a key milestone failure from an LAPD report filed after the six-month trial program finished on 8/25/20. We found this report through our continued research on the company. There isn't any evidence that company executives have referenced or mentioned the LAPD report. This is the only comprehensive in-field study that has been done on the BolaWrap. So why haven't the results been released to investors? It's bad news.
>
> Over a six-month period, 200 BolaWrap devices in the hands of 1,100 LAPD officers in the field were only used nine times, and only worked once. On an annualized basis, this comes to each BolaWrap is only used 0.09 times per year. Or, once every 11 years. At least 191 BolaWraps weren't used at all in the pilot program, they were just sitting there collecting dust. We believe this was about the worst result that could've happened from the program. The only way it could've been worse, is if the BolaWrap didn't work at all.

This was an important pilot program, that will be looked at by potential large police departments. The following statements by WRTC management illustrate how much time, expense, and training was put into the LAPD pilot program.

\* \* \*

***An Analysis Of The LAPD BolaWrap Pilot Trial Results***

The LAPD Pilot Program results can be found here. It's dated 8/25/20 from the Chief of Police to the Board of Police Commissioners. The program reviewed was from 2/5/20 until 8/10/20. It states:

the BolaWrap has been utilized nine times. Due to an insufficient sample size, an additional 180 days is needed in order to evaluate the effectiveness of the device.

The nine incidents of utilization are described in the report. It says that the number of incidents where the device was effective was six times. But looking at it closely, the BolaWrap did what it's supposed to do, as shown in the WRTC demonstration videos, only once.

Analyzing each of the incidents:

1. A naked man was running in and out of traffic. The BolaWrap was deployed, it hit him in the legs but didn't wrap. This made the suspect take a fighting stance. An officer deployed his baton on the suspect, and he was taken into custody without further incident. This incident is marked as "effective" but it really wasn't. It didn't wrap around and disable the suspect but in fact made him more hostile as he took a fighting stance. The officer had to use force with his baton, which could've been used without the BolaWrap and likely end up with the same result.

2. A call came in to report a male with a mental illness. The BolaWrap wrapped around the suspect but he was wearing a "puffy jacket" and he immediately pulled his arms free. This incident was marked "ineffective".

3. A call came in to report an ADW (Assault with a Deadly Weapon) suspect. Officers observed the suspect with a pipe in his hands. The officers told the suspect to drop it, but he wouldn't comply. First, the 40mm Less-Lethal

Launcher was used to strike the suspect but had no effect. Then the BolaWrap was deployed at the suspect's legs. It didn't wrap around his legs, but the suspect immediately complied afterwards. This incident was marked "effective" because no additional force was needed after the BolaWrap was deployed. But again, it wasn't really effective because it didn't do what it's supposed to do, which is wrap around a suspect.

4. A call came in to report an ADW suspect with a knife. The suspect failed to comply with officers' commands. The BolaWrap was deployed at the suspect's legs and successfully wrapped around him, stopping his advancement. This was the only time out of these nine utilizations that the BolaWrap successfully "wrapped" a suspect.

5. Officers were in pursuit of a suspect. The BolaWrap was shot at the suspect's legs. Again, it didn't wrap around the suspect's legs, but it startled the suspect and he was taken into custody. This was marked "effective", but in our opinion it wasn't. Again, the BolaWrap didn't work like it's supposed to - it didn't wrap.

A man was disturbing the peace. The BolaWrap was deployed at the suspect's legs. It hit the suspect's legs but didn't wrap around it completely, and he stepped out of the tether. The officers then utilized a team takedown to take the suspect into custody. This was marked "effective" as it stopped the suspect from walking away. This is more effective than the other times, because he had to actually step out of the tether, which slowed him down. But still, it didn't wrap completely around his legs.

6. A call came in of an arson suspect. The BolaWrap was deployed at the suspect's legs, it hit him in the knee but didn't wrap. He was stunned by the impact, and was taken into custody without further incident. Because there wasn't further incident, it was marked effective, but in reality it was another fail.

7. A call came in of a family dispute. The suspect was armed with a large stick. The BolaWrap was shot at his arms, but didn't wrap, possibly because it hit a fence behind the suspect. The officers then utilized a 40mm Less Lethal Launcher and the suspect was taken into custody. This was marked as ineffective because it didn't wrap and another tool was necessary to take the suspect into custody.

Verified Shareholder Derivative Complaint

8. A suspect refused to comply with officers' orders and the BolaWrap was deployed. It missed the suspect. Therefore, it was deemed ineffective.

82.     Following this report, the Company's share price fell from $8.14 at close of trading on September 22, 2020, to an intraday low of $5.68 per share—a drop of more than 30.2%—before closing at $6.07 on September 23, 2020, a loss of roughly 25.4%. In total, this series of disclosures resulted in an aggregate decrease of 57.8% from a Relevant Period high of $14.40 per share on July 17, 2020.

## DAMAGES TO WRAP

83.     As a direct and proximate result of the Individual Defendants' conduct, Wrap has lost and expended, and will continue to lose and expend, many millions of dollars.

84.     These expenditures include, *inter alia*, legal fees associated with the Consolidated Class Action filed against the Company, its two former CEOs, its President and interim CEO, its former COO and current CSO, and its CFO, and amounts paid to outside lawyers, accountants, and investigators in connection to the Consolidated Class Action.

85.     Such losses include, *inter alia*, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties.

86.     As a direct and proximate result of the Individual Defendants' conduct, Wrap has also suffered, and will continue to suffer, a loss of reputation and goodwill. Moreover, a "liar's discount" will plague the Company's stock in the future due to the Company's and the Individual Defendant's materially false and misleading statements and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

87.     Plaintiff incorporates by reference and realleges each allegation above.

88.    Plaintiff brings this action derivatively and for the benefit of Wrap to redress injuries suffered as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Wrap and for violations of the Exchange Act.

89.    Wrap is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court.

90.    Plaintiff is, and has continuously been since his purchase of Wrap stock at near the start of the Relevant Period, a shareholder of Wrap. Plaintiff will adequately and fairly represent the interests of Wrap in enforcing and prosecuting its rights, and has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

91.    A presuit demand on the Board of Wrap is futile and, thus, excused. At the time of filing of this complaint, the Board consists of Defendants Cohen, Kinsella, Norris, Parris, and Walker (collectively, the "Directors"). Plaintiff only need allege demand futility as to three of the five Directors who are on the Board at the time this action is commenced.

92.    Demand is excused as to all of the Directors because each one of them faces a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make, and/or cause the Company to make, materially false and misleading statements and omissions, while two of the Individual Defendants engaged in insider sales using material nonpublic information, receiving approximately $258,588 in proceeds, which renders the Directors unable to impartially and independently investigate the charges and decide whether to pursue action against themselves and the others involved.

93.    In total breach of their fiduciary duties, the Directors either knowingly or recklessly participated in making, and/or causing the Company to make, the materially false and misleading statements alleged above. The fraudulent scheme was intended to, among other things, make the Company appear more attractive to the investing public. As a result of which, the Directors each breached their fiduciary duties, face a substantial

likelihood of liability, are not disinterested, and demand upon them is futile and therefore excused.

94.    Demand on Defendant Cohen is futile for the following additional reasons. Defendant Cohen is the cofounder of the Company and has served as the Company's Executive Chair since July 2017. Therefore, he is a nonindependent director. Defendant Cohen has received, and continues to receive, substantial compensation for nondirector services including $120,000 during fiscal year 2019. Moreover, Defendant Cohen founded, owns, and serves as the Managing Partner of V3 Capital Partners, LLC, which provides the Company with certain investor, shareholder, and marketing services and also provided assistance to the Company in a qualified financing. As a Company director and Executive Chairman, he conducted little oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Cohen breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and thus excused.

95.    Demand is futile on Defendant Kinsella for the following, additional reasons. Defendant Kinsella has served as a Company director since November 2018. He also serves as the Chair of the Audit Committee, and as a member of both the Compensation Committee and the Nominating and Governance Committee. Defendant Kinsella has received, and continues to receive, substantial compensation for being a Company director. As a Company director, he conducted little oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Kinsella breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and thus excused.

96.     Demand is futile on Defendant Norris for the following, additional reasons. Defendant Norris has been a Company director since January 2018. Previously, he served as the Company's CEO from December 2018 until July 30, 2020. Defendant Norris has received, and continues to receive, substantial compensation, including at least $798,325 in 2019, for his services to the Company. As a result of his time as CEO and the attendant compensation, he is a nonindependent director. As a Company director, he conducted little oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Norris himself personally made the materially false and misleading statements during the July 30, 2020 earnings call. Further still, Defendant Norris signed, and thus personally made, the false and misleading statements in the SOX Certifications for the 1Q 2020 10-Q and the 2Q 2020 10-Q. In addition, Defendant Norris is a defendant in the Consolidated Class Action. For these reasons, Defendant Norris breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and thus excused.

97.     Demand is futile on Defendant Parris for the following, additional reasons. Defendant Parris has served as a Company director since November 2017. He also serves as a member of each of the Audit Committee, Compensation Committee, and Nominating and Governance Committee. Defendant Parris has received, and continues to receive, substantial compensation for his position as a Company director. As a Company director, he conducted little oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Parris breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and thus excused.

98.    Demand is futile on Defendant Walker for the following, additional reasons. Defendant Walker has served as a Company director since November 2018. He also serves as the Chair of both the Compensation Committee and Nominating and Governance Committee, and as a member of the Audit Committee. Defendant Walker has received, and continues to receive, substantial compensation for his role as a Company director. As a Company director, he conducted little oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Walker breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and thus excused.

99.    Demand is futile on the Board for the following, additional reasons.

100.    The Directors' longstanding business and personal relationships with one another and the other Individual Defendants prevent them from acting independently and in furtherance of the best interests of the Company and the shareholders. By way of example, Defendant Cohen cofounded the Company together with Defendant Barnes and Defendant Norris' father, nonparty E. Norris, who serves as the Company's CTO. Furthermore, three of five Directors have served on the Board for approximately three years or more. These conflicts of interest precluded, and continue to preclude, the Directors from exercising sufficient oversight of the Company's operations and internal controls and calling into question the Individual Defendants' conduct, both on and off the Board. Therefore, any demand on the Directors would be futile.

101.    Defendants Kinsella, Parris, and Walker (the "Audit Committee Defendants") served on Wrap's Audit Committee during the Relevant Period. The Company's Audit Committee Charter charges the Audit Committee Defendants with overseeing the integrity of the Company's financial statements, compliance with legal and regulatory requirements, and matters implicating ethical concerns. The Audit Committee Defendants failed to ensure

the integrity of Wrap's financial statements and internal controls, and allowed the Company to file false and misleading financial statements with the SEC, in contravention of their duties under the Audit Committee Charter. As a result of which, the Audit Committee Defendants have breached their fiduciary duties, are not disinterested, and demand as to them is futile and thus excused.

102.   In violation of the Company's own Code of Business Conduct and Ethics ("Code of Conduct"), the Directors conducted little oversight of the Company's internal controls over public reporting or of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. As a result of which, the Directors face a substantial likelihood of liability and demand is futile as to them and thus excused.

103.   Wrap has been, and will continue to be, exposed to significant losses due to the wrongdoing alleged herein. Still, the Directors have not filed any lawsuits against either themselves or others who were responsible for that wrongful conduct in an attempt to recover for Wrap any part of the damages Wrap suffered, and will continue to suffer, as a result of that wrongful conduct. Therefore, any demand upon the Directors would be futile and is thus excused.

104.   The Individual Defendants' conduct described above, was not the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Therefore, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the challenged transactions and are not capable of exercising independent and disinterested judgment about whether to pursue this action. Accordingly, demand is excused as being futile.

105.   The acts complained of herein constitute violations of fiduciary duties owed by Wrap's officers and directors. These acts are incapable of ratification.

106.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds. If there is a directors' and officers' liability insurance policy, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as the "insured-versus-insured exclusion." Under such a provision, if the Directors were to sue themselves or certain of the officers of Wrap, there would be no directors' and officers' insurance protection. Therefore, the Directors cannot be expected to bring such a suit against themselves or certain of Wrap's officers. On the other hand, if the suit is brought derivatively, as is this action, such insurance coverage, if it exists, will provide a basis for the Company to effectuate a recovery. Therefore, demand on the Directors is futile and thus excused.

107.   If there is no directors' and officers' liability insurance, then the Directors will not cause Wrap to sue the Individual Defendants, since, if they did, they would face a large uninsured individual liability. As such, demand is futile in that case as well and therefore excused.

108.   For all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with the requisite disinterestedness and independence. Consequently, a demand upon the Board is futile and thus excused.

Verified Shareholder Derivative Complaint

# FIRST CLAIM

## Against Individual Defendants for Breach of Fiduciary Duties

109.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

110.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Wrap's business and affairs.

111.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

112.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Wrap.

113.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

114.    In further breach of their fiduciary duties owed to Wrap, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) BolaWrap lacked utility due to its design being effective in only a very narrow set of circumstances (2) as a result of which, it was unlikely to be adopted for widespread use in the field; (3) Wrap had hidden the results of the LAPD Pilot Program, which revealed that BolaWrap was largely unused and ineffective and that the LAPD Pilot Program was only extended due to an insufficient sample size of BolaWrap deployments; (4) based on the LAPD Pilot Program, the LAPD and other police departments were unlikely to purchase BolaWrap devices and which seriously undermined the product's ability to generate revenue for Wrap; (5) the Company failed to maintain internal controls; and (6) as a result,

the Defendants' statements about the Company were materially false and misleading at all relevant times.

115.    The Individual Defendants failed to correct, and caused the Company to fail to correct, any of the wrongs described herein or correct the materially false and misleading statements and omissions referenced herein, rendering them personally liable to the Company for breach of their fiduciary duties.

116.    In breach of their fiduciary duties, two of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

117.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

118.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in

insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

119.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

120.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Wrap has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

121.   Plaintiff, on behalf of Wrap, has no adequate remedy at law.

## SECOND CLAIM

**Against Defendants Barnes, Norris, Rothans, Smith, and Thomas for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

122.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

123.   Wrap, along with Defendants Barnes, Norris, and Smith who are named as defendants in the Consolidated Class Action, and Defendants Rothans and Thomas who are named as defendants in one of the three actions constituting the Consolidated Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, as well as SEC Rule 10b-5 promulgated thereunder. If the Company is found liable in the Consolidated Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Barnes's, Norris's, Rothans's Smith's and Thomas's willful and/or reckless violations of their obligations as officers and/or directors of Wrap.

124.   Defendants Barnes, Norris, Rothans, Smith, and Thomas, because of their positions of control and authority as officers and/or directors of Wrap, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of

Verified Shareholder Derivative Complaint

Wrap, including the wrongful acts complained of herein and in the Consolidated Class Action.

125.    Accordingly, Defendants Barnes, Norris, Rothans, Smith, and Thomas are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

126.    As such, Wrap is entitled to receive all appropriate contribution or indemnification from Defendants Barnes, Norris, Rothans, Smith, and Thomas.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Wrap, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Wrap;

(c)    Determining and awarding to Wrap the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with prejudgment and postjudgment interest thereon;

(d)    Directing Wrap and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Wrap and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies

and guidelines of the Board;

     2. a provision to permit the shareholders of Wrap to nominate at least three candidates for election to the Board; and

     3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

     (e)    Awarding Wrap restitution from the Individual Defendants, and each of them;

     (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

     (g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: January 19, 2021        Respectfully submitted,

               */s/ Robert C. Moest*
               Robert C. Moest, Of Counsel, SBN 62166
               **THE BROWN LAW FIRM, P.C.**
               2530 Wilshire Boulevard, Second Floor
               Santa Monica, California 90403
               Telephone: (310) 915-6628
               Facsimile: (310) 915-9897
               Email: RMoest@aol.com
               *Local Counsel for Plaintiff*

               **PAWAR LAW GROUP, P.C.**
               Vik Pawar
               20 Vesey Street, Suite 1410
               New York, NY 10007
               Telephone: (212) 571-0805
               Facsimile: (212) 571-0938
               Email: vikrantpawaresq@gmail.com

               *Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## VERIFICATION

I,    Ray Westerman am    a    plaintiff in    the    within    action.
I have reviewed the allegations made in this verified consolidated
shareholder derivative complaint, know the contents thereof, and authorize its filing.
To those allegations of which I have personal knowledge, I believe those allegations
to be true. As to those allegations of which I do not have personal knowledge, I rely upon
my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15th
day of Jan , 2021.

Ray Westerman